Filed 7/16/15; pub order 7/30/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROMERO GARCIA et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>SEACON LOGIX, INC.,<br><br>Defendant and Appellant. | B248227<br><br>(Los Angeles County<br>Super. Ct. No. NS024850) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge. Affirmed.

Prima Law Group, Inc., Naveen Madala, Kevin H. Sun and Noah McCall for Defendant and Appellant.

State of California, Department of Industrial Relations, Division of Labor Standards Enforcement, David L. Gurley and Edna Garcia Earley for Plaintiffs and Respondents.

Plaintiffs and respondents Romeo Garcia, Eddy Gonzalez, Wilmer Urbina, and Desiderio Aguilar (collectively "respondents") were truck drivers for defendant and appellant Seacon Logix, Inc. ("Seacon"). Respondents sued Seacon under Labor Code section 2802[1] for the reimbursement of paycheck deductions, contending that they should have been classified as employees, not independent contractors. Following a bench trial, the trial court agreed and awarded damages for specified paycheck deductions. In this appeal from the judgment, Seacon contends that the trial court's finding that respondents are its employees is not supported by substantial evidence, and that the damages are excessive. We conclude that substantial evidence supports the finding that respondents are employees, and that Seacon has forfeited its challenge to the damages awarded. Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Overview*

Seacon's business involves arranging the transportation of cargo from the Port of Long Beach and Port of Los Angeles to warehouses or other facilities. Respondents were truck drivers who transported the cargo for Seacon.

Around 2008, the ports began to implement a clean air program, prohibiting older trucks from accessing the ports. Prior to the clean air program, truck drivers generally owned their own trucks and worked as independent contractors. After the implementation of the clean air program, older, higher-emission trucks no longer were allowed access to the ports; thus, companies such as Seacon purchased trucks that were compliant with the clean air rules. Although the drivers no longer

---

[1] All section references are to the Labor Code.

2

owned the trucks they drove, Seacon continued to treat the drivers as independent contractors, requiring them to enter into lease agreements for the use of the trucks and deducting lease and insurance payments from their paychecks.  Respondents filed claims with the State Labor Commissioner's Office, seeking to recover those deductions on the basis that they were employees, not independent contractors.  (§ 98.)  After the State Labor Commissioner ruled in favor of respondents, Seacon appealed the awards to the superior court.  Following a bench trial, the superior court found that respondents were employees, not independent contractors.  The court thus entered judgment in favor of respondents in the amounts requested: $29,013.40 to Garcia, $19,884.40 to Aguilar, $20,686.35 to Gonzalez, and $38,218.91 to Urbina.

*Employment Applications and Other Documents*

All four respondents testified at trial.  In order to begin transporting goods for Seacon, drivers were required to complete various documents, including the following:  an employment application; sub-haul agreement with independent contractor; transportation agreement; and an equipment lease and indemnification agreement.  Respondents also were required to have a Class A license to drive the trucks.

Pursuant to the equipment lease and indemnification agreement, respondents paid $450 per week for the use of the truck and $200 per week for insurance for 260 weeks.  At the end of the 260 weeks, title would be transferred to the lessee for $1.  The lease agreement purported to define the parties' relationship, stating that the lessee "shall perform the services and other obligations under this Agreement as an independent contractor and not as an employee of LESSOR."  Each lease agreement, except Urbina's, specified which truck was being leased to the driver.

3

The sub-haul agreement, signed by Gonzalez and Garcia, defined the driver as an independent contractor. The agreement stated that the sub-hauler "shall determine" issues such as when a load is to be picked up, the selection of routes, the delivery time, his working hours, his insurance coverage, and the method of financing his vehicle.

The transportation agreement, signed by Urbina and Aguilar, defined the driver as a subcontractor. It also provided that the subcontractor was free to use his equipment for any other business purpose.

*Use of Trucks*

Seacon was the registered owner of the trucks, and the keys were given to the drivers by Chris Hyon, Seacon's daily operations manager. The drivers were told that the trucks were always to be kept in Seacon's yard and were not to be taken home or used for personal use. Seacon provided respondents with permanent Seacon logo stickers to affix to the truck. The registrations for the trucks were in Seacon's name, and the insurance was provided by Seacon.

In 2007, prior to working for Seacon, Urbina had owned his own truck and worked for a company called New Trend Logistics. He stated that when he owned his truck, he was not an employee, and New Trend Logistics paid him by the load, rather than on a weekly basis. The dispatcher at New Trend Logistics encouraged Urbina to drive as many loads as he could and, at the end of each day, Urbina reported how many loads he had completed. Urbina understood that it was his own truck, so he was able to take it home and choose his working hours.

4

*Working Conditions*

Respondents were told by Hyon and Paul Lee (Seacon's dispatcher) to arrive at work by 7:00 a.m. Respondents arrived by 7:00 a.m. five days a week. They were required to call to let Seacon know if they were going to be absent. If the drivers declined a delivery for any reason, they would not receive work the following day.

Lee assigned deliveries to the drivers and occasionally provided them with maps showing the route to take. Respondents were required to call Lee when they arrived at their destination and completed their delivery. Because they were required to check in with Lee for every delivery, they spoke with him numerous times each day. They also were required to tell Lee if they were going to be late with a delivery due to traffic or any other reason.

Respondents did not have separate business licenses or any other source of income while driving for Seacon. Seacon did not permit respondents to hire other drivers to use their trucks or to use the trucks to work for other companies. Hyon and Lee told respondents the trucks belonged to Seacon and could not be used for any other company's work. Respondents were not involved with billing Seacon's customers and did not believe they had the ability to negotiate their payments.

Respondents were paid by Seacon on a weekly basis. They did not understand how the amounts of their paychecks were calculated, testifying that Hyon determined the amounts. The $450 lease payments and $200 insurance payments usually were deducted from their weekly paychecks, although occasionally a smaller amount was deducted, when determined by Hyon.

*Termination*

Aguilar was terminated after he took five days off to care for his son. He asked permission for time off from a Spanish-speaking secretary named Yvette, who told him that she would explain the situation to Hyon. When Aguilar returned to work after taking care of his son, Hyon took the truck keys from him and told him he was no longer needed. According to Aguilar, Hyon never told him that he was behind on his lease payments.

Gonzalez similarly was terminated after taking a week off for his mother's funeral. Gonzalez told Yvette he would be gone for a week, but Hyon took the truck keys away from Gonzalez when he returned. Gonzalez testified that he did not have the option of continuing to make the lease payments and use the truck after being terminated.

Urbina was terminated after Seacon's insurance company declined to insure him. Urbina then obtained his own insurance policy, but Hyon told him the truck could not be insured under two different policies, so Urbina was terminated.

According to Garcia, Hyon terminated him after he tried to negotiate with Hyon for more money for fuel.

*Testimony of Seacon Employees, Hyon and Lee*

Hyon described Seacon as a logistics company, although he acknowledged that Seacon's primary function was to deliver cargo to and from ports and warehouses. He acknowledged that he alone determined how much the drivers would earn per delivery and how much they paid for insurance. Hyon denied firing Gonzalez for taking a week off for his mother's funeral. Instead, he stated that he terminated the contract because he was afraid Gonzalez would not keep up with the lease payments. However, Lee testified that Seacon directed him to fire

6

Garcia because Garcia refused to allow Seacon to inspect his truck. Lee denied that Garcia was terminated for being behind in his lease payments.

According to Hyon, he terminated only the lease agreements, not the sub-haul or transportation agreements, with Garcia, Gonzalez, and Aguilar, and he terminated the lease agreements because they were behind on their lease payments. When he terminated the contracts with Gonzalez, Garcia, and Urbina, he did not give them 30 days' notice, as required by the contract. He terminated Aguilar's contract because he "disappeared" for two weeks and did not respond to attempts to contact him.

Hyon denied requiring the drivers to check in during the day or follow a specific route. He further denied retaliating against a driver for rejecting an assignment.

Hyon stated that no driver asked if he could work for another company until sometime in 2011 or 2012. He replied that he needed to check insurance and liability issues and subsequently told the driver that he could if he met certain conditions, such as continuing to make lease payments.

According to Hyon, Urbina earned $40,000 in six months of work, while Garcia earned $24,000 during the same period. He explained that Urbina earned more because he took any available job and worked diligently.

Hyon was aware of two drivers who leased trucks from Seacon but did not park in Seacon's yard. He testified that any driver could lease the truck, work for a different company, and keep the truck in Seacon's yard and take it home if he preferred. The drivers parked in Seacon's yard because the ports prohibited parking the trucks on the street.

Lee, Seacon's dispatcher, described Seacon as a trucking company in the business of moving containers to customers. He conceded that the drivers were

7

essential to the business. Between August 2010 and May 2011, 19 of Seacon's 22 workers were drivers; the other three were office staff. Lee denied requiring the drivers to arrive at a certain time or to show up at all, stating that there would be no consequence if a driver did not show up for several days in a row. He also denied requiring the drivers to let him know if they were going to be late with a delivery because of traffic. He acknowledged, however, that he generally knew where the drivers were at all times throughout the day.

*Testimony of Witnesses Called by Seacon*

Seacon subpoenaed two witnesses, Eddie Solares and Jaime Carrillo, who were drivers for Seacon. Solares testified that Seacon controlled his daily activities by giving him a load, telling him where to deliver it, and then giving him the next load. The dispatcher supervised his daily activities by controlling all his movements. When Solares rejected an assignment, Seacon did not give him work the following day. Consistent with respondents' testimony, Solares testified that Hyon told him the trucks belonged to Seacon, and he could not work for another company. Solares previously had owned his own truck, but when the port mandated the use of clean trucks, he was unable to drive his truck, so he needed to use Seacon's truck. When he owned his own truck, he considered himself an independent contractor.

Carrillo testified that when he owned his own truck, he was a subcontractor. He was hired as a Seacon employee and was required to lease a truck. Seacon controlled every aspect of his daily work, assigning him loads, telling him the routes to take and what time to arrive and leave. Carrillo stated that if he needed to leave early one day, he would not receive work the following day. Hyon previously had told Carrillo he could not work for another company. However,

8

after respondents' claim was filed, Hyon told him he could work for other companies.

## DISCUSSION

I.      *Substantial Evidence*

Seacon contends that the trial court's finding that respondents were employees, not independent contractors, is not supported by substantial evidence. We disagree.

"In reviewing the evidence on appeal, we resolve all conflicts in favor of the prevailing party, and we indulge in all legitimate and reasonable inferences to uphold the finding if possible.  Our power begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding.  When two or more inferences can be reasonably deduced from the facts, we cannot substitute our own deductions for those of the trial court. [Citation.]"  (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 937 (*Air Couriers*).)

Respondents sought reimbursement under section 2802 for lease and insurance payments deducted from their weekly paychecks, as well as fuel and repair expenses.  Section 2802 provides in pertinent part that "[a]n employer shall indemnify his or her *employee* for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, . . . ."  (§ 2802, subd. (a), italics added.)

"Because the Labor Code does not expressly define 'employee' for purposes of section 2802, the common law test of employment applies.  [Citation.]" (*Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 10

9

(*Estrada*).) "'"[T]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . ." [Citations.]' [Citation.]" (*Arzate v. Bridge Terminal Transport, Inc.* (2011) 192 Cal.App.4th 419, 426 (*Arzate*); *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531 (*Ayala*).) In addition, there are a number of secondary factors, including "(1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship. [Citations.] The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship. [Citations.]" (*Estrada*, *supra*, 154 Cal.App.4th at pp. 10-11, fn. omitted; *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 351 (*Borello*).)

In finding that respondents were employees, not independent contractors, the trial court credited respondents' testimony that Seacon controlled the manner and means of their work, and rejected Seacon's evidence that respondents retained such control. The court also relied on evidence that Seacon required drivers to enter into both a lease agreement and a sub-haul agreement or transportation agreement, thereby obligating drivers to lease their trucks from, and drive them for, Seacon. The court determined that this arrangement gave Seacon "tremendous control" over the drivers because if they did not comply with Seacon's requirements, they

10

would lose their trucks. The trial court's conclusions are fully supported by the evidence.

A. *Control*

Respondents' testimony, credited by the trial court, clearly proved that Seacon controlled the manner and means of their work. According to respondents, they were required to arrive at work at times specified by Seacon, and required to call if they were going to be late or absent. (See *Ruiz v. Affinity Logistics Corp.* (9th Cir. 2014) 754 F.3d 1093, 1102 [drivers were employees, not independent contractors under California law where the company required drivers to report to warehouse and attend meeting every morning, and controlled equipment, appearance, and rate of pay].) Any absence had to be approved by Hyon. Lee assigned and tightly controlled respondent's delivery assignments. (See *Alexander v. FedEx Ground Package System, Inc.* (9th Cir. 2014) 765 F.3d 981, 989-990 [applying California law, finding that FedEx drivers were employees, not independent contractors, where, inter alia, FedEx controlled how and when drivers delivered packages, drivers' appearance, and their work hours] (*Alexander*).) Seacon provided the customers and determined the prices to be charged. (See *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1064 ["By obtaining the clients in need of the service and providing the workers to conduct it, [defendant company] retained all *necessary* control over the operation as a whole."]; *Alexander*, *supra*, 765 F.3d at p. 995 [reasoning that the customers were FedEx's customers, not the drivers'].) During respondents' work day, Lee maintained regular contact to monitor the progress of deliveries. Respondents had no choice of assignments, and declining an assignment resulted

11

in retaliation by being refused work.  Respondents were not allowed to work for another company, and could use their truck only for jobs with Seacon.

Respondents' testimony was corroborated by Solares and Carrillo, who testified that Lee controlled their daily activities and movements, and that Hyon told them they could not work for a different company and that the trucks belonged to Seacon.

Seacon challenges the sufficiency of this evidence by relying on the testimony of Hyon and Lee, which was not credited by the trial court.  Of course, on appeal, we do not reweigh the evidence, and determine only "whether there is any substantial evidence, *contradicted or uncontradicted*, that will support the finding."  (*Air Couriers*, *supra*, 150 Cal.App.4th at p. 937, italics added.)

Seacon also contends that the trial court's finding regarding control is contradicted by the language of the sub-haul agreement and the transportation agreement.  The sub-haul agreement, signed by Gonzalez and Garcia, defined the driver as an independent contractor.  The agreement stated that the sub-hauler "shall determine" issues such as when a load is to be picked up, the selection of routes, the delivery time, his working hours, his insurance coverage, and the method of financing his vehicle.

The transportation agreement, signed by Urbina and Aguilar, similarly defined the driver as a subcontractor.  The transportation agreement provided, inter alia, that the subcontractor was free to use his equipment for any other business purpose.

However, the language in the agreements giving the drivers control over their work and describing them as independent contractors is not dispositive.  (See *Estrada*, *supra*, 154 Cal.App.4th at pp. 10-11 ["The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship.

12

[Citations.]"]; *Borello*, *supra*, 48 Cal.3d at p. 349 ["The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced. [Citations.]"].) As we have explained, regardless of the language of the sub-haul agreement and transportation agreements, substantial evidence proves that Seacon effectively controlled the manner and means of respondents' work.

B. *Secondary Factors*[2]

"[W]hile the right to control work details 'is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.' [Citation.]" (*Arzate*, *supra*, 192 Cal.App.4th at p. 426.) "The individual factors '"cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations."' [Citations.]" (*Id.* at pp. 426-427, fn. omitted.) Here, the balance of these secondary factors supports the finding that respondents are employees. We discuss each factor in turn.

1. *Right to Discharge at Will*

"'[Strong] evidence in support of an employment relationship is the right to discharge at will, without cause. [Citations.]' [Citation.]" (*Borello*, *supra*, 48 Cal.3d at pp. 350-351; see also *Ayala*, *supra*, 59 Cal.4th at p. 531 ["Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' [Citations.]"].) Here, respondents testified that they were terminated suddenly and

_____

[2] Although the parties discuss the secondary factors in detail, we address them cursorily because the trial court's decision rested primarily on its finding regarding control.

13

with no notice by Seacon – Aguilar on the day he returned from five days off to take care of his son, and Gonzalez upon his return from his mother's funeral. Thus, the evidence supported a finding that Seacon terminated respondents at will.

Noting that the termination clauses in the transportation agreement and sub-haul agreement required 30 days' notice or written notice, Seacon contends respondents were not dischargeable at will. However, the existence of the termination clauses does not mean that respondents' testimony is insufficient to prove that despite the clauses, Seacon exercised the right to terminate at will.

### 2. *Distinct Occupation*

A finding of employment is supported where the workers are "a regular and integrated portion of [the] business operation." (*Borello*, *supra*, 48 Cal.3d at p. 357.) As the trial court found, there is little to no distinction between respondents' work and Seacon's business. Although Hyon described Seacon as a logistics company, he acknowledged that Seacon's primary function was to deliver cargo from the ports to warehouses and back. Because Seacon's business consisted almost entirely of transporting cargo, respondents' work transporting that cargo did not constitute a distinct occupation or business. (See *Alexander*, *supra*, 765 F.3d at p. 995 [describing drivers' work as "'wholly integrated into FedEx's operation'"].)

### 3. *Work Under Principal's Direction or Without Supervision*

As already discussed, the evidence that Seacon controlled respondents' work by setting their hours, assigning their jobs, and monitoring their progress throughout the day supports a finding that respondents worked under Seacon's direction.

14

### 4. *Skill Required*

The trial court found that this factor did not favor either party, reasoning that the work required a Class A license, but little other skill. We agree.

### 5. *Instrumentalities, Tools, and Place of Work*

Seacon provided the trucks and required respondents to report to work at its yard and park the trucks there. Although Seacon argues that the drivers, not Seacon, provided the trucks, there is substantial evidence that Seacon owned the trucks and did not allow respondents to use the trucks for any purpose other than working for Seacon. (See *Estrada*, *supra*, 154 Cal.App.4th at p. 12 [substantial evidence supported the conclusion that drivers were employees, not independent contractors, where their trucks and scanners "are obtained from FedEx-approved providers, usually financed through FedEx, and repaid through deductions from the drivers' weekly checks"].)

### 6. *Payment by Time or by Job*

Where workers are paid weekly or by the hour, rather than by the job, it suggests an employment relationship. (See *Estrada*, *supra*, 154 Cal.App.4th at p. 12.) The trial court found that this factor supported a finding that respondents were independent contractors. Although respondents received weekly paychecks, the court noted that they were paid by the delivery. The court further found that respondents' assertion that they were unable to negotiate the amount they received per delivery was not supported by the evidence. Urbina testified that he once attempted to negotiate a higher rate, but he was unsuccessful. The court ultimately concluded that this consideration was not "particularly probative." Given the

15

strength of the evidence supporting an employment relationship, the court was well within its discretion to discount the probative value of this factor.

### 7. *Work Part of Principal's Regular Business*

As the trial court stated, and the evidence already discussed proved, respondents' work is part of Seacon's regular business, because Seacon's entire business is "to move cargo for the customer."

### 8. *Parties' Belief*

The trial court found that this factor did not favor either party, stating that, not surprisingly, respondents believed they were forming an employment relationship, and Seacon believed they were forming an independent contractor relationship. We find no fault in that reasoning.

### 9. *Conclusion*

Taking into consideration all of the above factors, the trial court's reasoning is unassailable: substantial evidence proves that the balance of the secondary factors, like the primary factor of control, supports the finding that respondents were employees, not independent contractors.

## II. *Seacon Forfeited the Issue of the Amount of Damages*

Seacon contends that the trial court erred in determining the amount of damages by including compensation for clean truck fees and fuel surcharges. However, Seacon has forfeited this issue on appeal by failing to raise it in the trial court. (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1232.) In its reply brief, Seacon contends that it did raise the issue in the trial court, citing numerous

pages in the trial transcript.  But the pages cited merely include  references by the parties or attorneys to the clean truck rules or clean truck fees at trial.  None involves an objection to compensation for clean truck fees and fuel surcharges.

Moreover, besides failing to raise the issue in the trial court, Seacon has failed in its appellate briefing to provide us with any citation to legal authority that supports its position.  The two cases cited in Seacon's reply brief, *Estrada*, *supra*, 154 Cal.App.4th at page 26, and *Porter v. Quillin* (1981) 123 Cal.App.3d 869, do not discuss the issue.  "'An appellate brief "should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as [forfeited], and pass it without consideration." [Citation.]' [Citation.]  It is not the function of this court to comb the record looking for the evidence or absence of evidence to support [a party's] argument. [Citations.]" (*People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879; see Cal. Rules of Court, rule 8.204(a)(1)(C) [appellate briefs must be supported by record citations]; *People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 502–503 [articulating rule that if party fails to support its argument with necessary citations to the record the argument will be deemed waived].)

For both the above reasons, we conclude that Seacon has forfeited its challenge to the amount of damages awarded.

**DISPOSITION**

The judgment is affirmed.  Respondents are entitled to costs on appeal.



WILLHITE, Acting P.J.


We concur:



MANELLA, J.



COLLINS, J.

18

Filed 7/30/15

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| ROMERO GARCIA et al., | B248227 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. NS024850) |
| v. | |
| SEACON LOGIX, INC., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |

THE COURT:*

The opinion in the above-entitled matter filed on July 16, 2015, was not certified for publication in the Official Reports.  Good cause appearing, it is ordered that the opinion in the above entitled matter be published in the official reports.

---

*WILLHITE, Acting P.J.          MANELLA, J.          COLLINS, J.